# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 25, 2012 Session

## STATE OF TENNESSEE v. CODY COFER

**Direct Appeal from the Criminal Court for Cumberland County**
No. 09-0016     David Patterson, Judge

---

**No. E2011-00727-CCA-R3-CD - Filed August 20, 2012**

---

A Cumberland County jury convicted the Defendant, Cody Cofer, of two counts of felony murder and one count of attempted especially aggravated robbery. The trial court imposed consecutive life sentences for the felony murder convictions, ordering those sentences to run concurrently with the twelve-year sentence it imposed for the attempted especially aggravated robbery conviction. On appeal, the Defendant argues that: (1) the evidence is insufficient to support his convictions; (2) the trial court erred when it allowed the jury to determine whether a witness was an accomplice; (3) the trial court erred by refusing to give a missing witness instruction to the jury; (4) the State's closing argument was improper; and (5) the trial court erred when it imposed consecutive life sentences. Following our review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Mary C. White, Murfreesboro, Tennessee, and Robert L. Marlow, Shelbyville, Tennessee, for the appellant, Cody Cofer.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randy York, District Attorney General; Gary McKenzie and Amanda Hunter, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Facts
### A. Jury Trial

1

This case arises from the Defendant's participation in a home invasion that resulted in the shooting deaths of two victims, Keith Patton and William Asher. Several individuals participated in this home invasion to varying degrees, including: the Defendant, Joshua Hutson, Alexander Carino, and Amanda Spence. For his role in these crimes, a Cumberland County grand jury indicted the Defendant for two counts of felony murder and one count of attempted especially aggravated robbery.

At the trial on these charges, the parties presented the following evidence: Tyler Rhinehart testified that, in November 2008, he was fourteen years old. Rhinehart said that he knew both victims in this case: Patton was a family friend and Asher employed him to clean out horse stalls at Asher's farm. Rhinehart recalled that, on November 7, 2008, a group of people that included both Patton and Asher met at Cancun's restaurant in Crossville to celebrate Rhinehart's father's birthday. After the dinner and on the drive home, Rhinehart's father stopped at Patton's home in Crab Orchard to use the restroom. Rhinehart said that he entered Patton's home and sat down in a chair in the living room while he waited for his father. Rhinehart described the other people in the room and their locations, saying that Jackie Garrison, his stepmother's father, and Asher were seated on the couch, Patton was seated in a rocking chair, and Michael, a boy his stepmother Angie cared for, sat in a chair "on the other side of the room." Rhinehart said that "other people" in the residence were in the back bedroom.

Rhinehart testified that, as he sat in the living room talking with the others, two men wearing black masks and carrying guns entered the room and demanded money. Rhinehart recalled that as Patton walked toward the two men, telling them to "get out of his house," the two men began shooting. Rhinehart described the first man who entered the living room as "a little bit taller than the second." Rhinehart recalled that the first man carried an AK47 assault rifle with a loaded clip and one clip attached to the gun. The second man carried a pistol. He said that he did not see the man with the pistol actually fire the gun because he was focused on protecting himself from the gunfire. Rhinehart said that, to his knowledge, Patton did not have a weapon at the time of the shooting.

Rhinehart testified that he laid down on the floor and, after the gun fire stopped, the man carrying the pistol put the pistol up against Rhinehart's head and told him to "get off the phone." Rhinehart sat up and told the man he did not have a phone. The man carrying the AK47 walked into the adjoining kitchen, toward the back bedroom where Rhinehart could no longer see him. Rhinehart recalled that Patton was lying on the floor next to him, and he could see Patton's gunshot wounds. Asher, who was still seated on the couch, was "leaned back" with his leg on the rocking chair breathing heavily like he was "trying to get air." At some point after the shooting, Rhinehart saw a third man, who wore a black mask with a white "skeleton type" design on it, stick his head through the door "like [he was] trying . .

2

. to figure out what was going on." The man carrying the pistol pushed the third man out of the doorway and told him to "get out there and watch out."

Rhinehart testified that he heard a truck outside and one of the gunmen yelled "it's the boys," and the two men ran out of the house. Shortly thereafter, a friend of Patton's appeared at the door and asked to see Patton. When he saw Patton lying on the floor he walked over and began checking on him. Meanwhile Rhinehart heard a small four-cylinder vehicle, possibly a Kia, start up outside. Rhinehart recalled that his stepmother, Angie, called 911 and his father instructed Jackie Garrison to leave with Rhinehart and Michael "in case somebody came back."

On cross-examination, Rhinehart agreed that, early on the morning after the shooting, he told police that the man who first entered the living room carrying the AK47 was "about six foot tall, slim build and talked with a thuggish accent." Rhinehart also told police that the second man who entered the living room carrying the pistol was "about five foot two inches and skinny," dressed similarly to the first except he wore "gray tennis shoes with drawstrings." About the third man who had been standing outside, Rhinehart described him to police as "about five foot one inch" tall and "kind of fat." He said this man was "wearing a black hooded jacket, black toboggan, black and white skeleton motorcycle mask covering his head and face[,]" and black gloves. Rhinehart testified that he could not tell the race of the three men because all three men were "pretty well covered."

Jackie Garrison testified that his daughter, Angie, is married to Rhinehart's father. Garrison said that he knew both of the victims in this case. Garrison recalled that, on the night of November 7, 2008, he went to Cancun restaurant in Crossville to celebrate his son-in-law's birthday. Garrison said that, after the dinner and on the drive home, Angie asked him to stop at Patton's house, so she could use the bathroom. Garrison stopped, and Patton invited them inside to visit "for a little while." Garrison said that he was inside Patton's home for about five minutes when two men entered the living room and demanded money. Garrison described the first man who entered the room as tall and the second man as "a little shorter." He recalled that both men were dressed in black and wearing gloves and masks. The taller of the two men carried an assault rifle with a clip in it and the shorter man carried a black pistol. Garrison clarified that it was the first man who entered the room that demanded money. In response to the demand, Patton stood up from his chair and began walking toward the men telling them to get out of his home. When Patton was approximately six to eight feet from the men, the intruders began firing their guns.

Garrison testified that he never saw the man with the pistol actually fire his gun. He explained that after the man carrying the assault rifle began shooting, he put his head down and began praying. He also said that, to his knowledge, Patton did not have a weapon at the

3

time of the shooting. After the gunfire ceased, the taller man carrying the assault rifle ran toward the back bedroom while the man carrying the pistol remained in the living room and kitchen looking through drawers and cabinets. Garrison recalled that he could see Patton lying on the floor bleeding and that Asher, who was next to him on the couch, was making gasping sounds. Garrison asked the man carrying the pistol if he could help Asher, and the man replied, "if you move, . . . you won't need no help either." Garrison interpreted the statement to mean that the man would shoot Garrison if he attempted to help Asher.

Garrison testified that, as soon as the two shooters left the house, he immediately took "the two young boys," Michael and Rhinehart, away from the premises. Garrison testified that he did not see a third person, only the two shooters. Garrison said that, based on his location in the living room, he could not see out the door.

On cross-examination, Garrison said the second man who entered the living room was substantially shorter than the first man who entered the room, estimating the height differential to be between four and six inches. Garrison said that he did not notice anything distinct about the two shooters' speech and that he did not know their race because both men were well covered.

Garrison recalled that a heavyset man came to the door after the two shooters had left. Garrison believed the man's name was "Reed." Garrison told the man to go get help, and the man got in his truck and left.

Blake Reed testified that he had been friends with Patton since the two were in high school. Although Reed did not know Asher personally, he lived near Asher and "knew of him." Reed recalled that he stopped by Patton's home at about 9:30 on the night of November 7, 2008. When he pulled in the driveway, he noticed a black car parked in the driveway with round tail lights "stacked side by side." Reed identified a photograph of a black Kia that belonged to the Defendant's friend, Autumn Hale, as looking "similar" to the one he saw the night of the shooting. Reed said that he emerged from his truck and had stepped up on the porch when "a man came busting out of the house." Reed said that he could not make out any distinguishing features but noted that the man wore dark clothes. The man told Reed to "get the f*** in the house." Because there was no light outside the house, Reed could not see what the man was holding but believed it to be a gun. Reed walked in the house and saw Patton lying on the floor. Garrison, who was seated on the couch, asked if the men were gone. Reed heard tires spin and gravel spewing outside and responded that the men were gone.

Joshua Hutson, a co-defendant in this case, testified that he had known the Defendant almost his whole life and that he met Alexander Carino, another co-defendant, about five

4

months before the shooting. Hutson said that he and Carino discussed the potential of committing a robbery and that he agreed to participate. Hutson recalled that, on November 7, 2008, he spent most of the day at home. In the evening, his girlfriend at the time, Anna Claire Daniels, drove him to meet the Defendant and Carino at a Taco Bell in Oak Ridge, Tennessee. Hutson said Carino drove the three men in a "dark colored four door Kia" to Cumberland County. Hutson said that Daniels was not "involved in any plan" but that she knew the three men were going to rob someone. Hutson said that Daniels "probably [did] not" agree with what he was doing but that she did not tell Hutson not to go.

Hutson testified that, on the way to Cumberland County, the men stopped at the Defendant's home for the Defendant to retrieve black clothing. The Defendant also purchased gloves at a gas station for the Defendant and Hutson. Hutson said that all of the men dressed similarly, although Hutson's mask had a camouflage pattern covering the bottom portion of the mask. Once the men arrived in Cumberland County, they drove down Highway 70 looking for the "right home." Carino was not sure which home was Patton's, so he called Amanda Spence, who knew the location of Patton's home, but she did not answer her phone.

Eventually, Spence returned Carino's call, and the men drove to Spence's home. Hutson said that he had only met Spence one time previously. Hutson recalled that Carino, the Defendant, Spence, and a friend of Spence's were all present when they discussed the robbery. Spence provided the men with a diagram of the layout of the residence. Spence then went with the men to "scout[ ] the place out." Hutson said they had guns in a bag in the trunk of the Kia. After returning to Spence's house, Hutson took the driver's seat and drove the men to Patton's home where he stopped in front of the neighbor's driveway. The Defendant and Carino got out of the Kia with guns and walked toward the residence, while Hutson drove down the street and then back past Patton's home, ultimately parking in the driveway.

Hutson testified that, before Carino and the Defendant went into Patton's home, he and Carino placed their cellular phones and keys in the glove compartment of the Kia. The State produced, and Hutson identified, both his and Carino's cellular phones. Hutson recalled that, after he parked in Patton's driveway, he got out and walked around to the front of the car. Carino instructed Hutson to turn off the headlights, and Hutson did so. Hutson said that Carino was standing at the corner of the house closest to the door while the Defendant was on the other corner. Carino entered the house first, carrying an assault rifle, and then the Defendant entered, carrying a handgun. Hutson said that he stood beside the driver's side door as the men entered the home. Almost immediately, Hutson heard "rapid gunshots," so he reached in the glove compartment, grabbed the cellular phones and keys, and ran to the front porch. When he looked in the residence he saw someone sitting on the

5

couch "that stared directly back at [him]," a man lying on the floor, and the Defendant standing with the pistol drawn. The Defendant told Hutson to "keep a lookout," so Hutson ran back to the driveway. Within a minute, another car pulled into Patton's driveway, and Hutson fled.

Hutson described himself as "pretty scared" at the time. He then apologized to the families of the victims and said that "not a day goes by that I don't wish things were different and wish that I could turn back time." Hutson said that he felt responsible for his role in these crimes.

Hutson testified about his flight into the woods. He said that he was unfamiliar with the area and quickly became lost, so he tried to call Daniels, who did not answer her cell phone. He said that he spoke with the Defendant, who was with Carino, several times and learned that both men had left Patton's home and that Spence would pick Hutson up. Hutson recalled that he exited the woods looking for Spence twice. The first time he left the woods he saw a police car and the second time he saw a white pick-up truck. The white pick-up truck stopped and a woman got out of the truck with a shotgun and told Hutson to lie on the ground. Hutson said that he complied, and the woman waited there until police arrived and Hutson was taken into custody. Hutson said that, during his flight through the woods, he threw out a .22 caliber derringer, the gloves, the mask, and he lost a shoe close to the road where he was arrested.

Hutson testified that he did not take responsibility initially and lied to investigators. Hutson explained that he did so because he was scared of possible retaliation. Hutson told investigators what they already knew and what he thought they might believe because he was "really overwhelmed with the whole situation." Hutson agreed that he was charged with the same crimes as the Defendant and that he hoped for some form of leniency for his testimony. Hutson denied that the State had made any promises as to his potential sentence. Hutson said that he was not testifying because he wanted a "get out of jail free card" but because he believed it was important for him to take responsibility for his actions by telling the truth. Hutson said that he had not spoken with Carino, the Defendant, or Spence since the shooting.

On cross-examination, Hutson agreed that he had bought and sold marijuana and cocaine. Hutson said that "marijuana was being smoked" during the afternoon and evening of the robbery. Hutson confirmed that his conversations about the robbery, prior to its occurrence, were with Carino and not the Defendant. Carino told Hutson that Spence knew someone they could rob. Hutson again confirmed that Daniels, who drove him to meet Carino and the Defendant, knew that the men were going to Cumberland County to rob someone. Hutson agreed that, if he had returned with money, Daniels would have benefitted from it. Hutson also agreed that Daniels never tried to discourage him from participating.

6

Although Daniels knew Hutson owned a .22 caliber pistol, she did not know that he took the gun with him or that the two other men took guns.

Amanda Spence, a co-defendant, testified that she had known Alexander Carino since she was fifteen and that his nickname was "Reno." She said that she did not meet the Defendant until the night of the shooting. Spence explained that, at the time of these events, Carino was her drug source for cocaine and occasionally marijuana. Spence recalled that Carino told her that he needed to "hit some lick." Spence explained that "hitting a lick" meant "[t]o rob someone." She said Carino asked her if she knew anyone he could rob, and she told him she did not. At the time of this conversation, other people were present at Spence's home, so Carino talked with "a couple other guys" about a specific place he could rob. Spence admitted that she played a role in relaying information from "the guys" to Carino about Patton's home as a potential robbery hit. Spence said that she did not know Patton, but she became familiar with where he lived through the course of these events.

Spence testified that she was in the process of moving on November 7, 2008, when she received several phone calls from Carino to her cellular phone. Spence returned Carino's phone calls, and he told her he was waiting for her at her house. Carino also texted Spence on that day telling her to "go by" Patton's residence to "see who was there and what was there and what it looked like." Spence said that she did not go to Patton's home and, instead, lied to Carino, telling him that she had gone by Patton's home. Spence explained that she lied to Carino to "pacify him" because he called repeatedly and would not "take no for an answer." Spence said that she did not believe that Carino was serious about the robbery because he "always talked about things like this and never actually went through with a lot of things that he talked about."

Spence testified that, after speaking with Carino on the phone, she went home where she found Carino in a black four-door vehicle with the Defendant and Hutson. Spence identified a black Kia in the State's photograph as looking like the car she saw the three men driving. Spence said that she repeated the same information to Carino about Patton's home and then gave him the directions to the house. Spence said that she asked Carino to take her to the store and, as they were preparing to leave, the Defendant brought a bag into her home. Spence asked Carino what was in the bag, and Carino told her that guns were in the bag.

Spence testified that, after leaving her residence, they drove by Patton's residence, which was dark. They returned to Spence's residence, where the three men took the bag of guns and left. Thirty minutes to an hour later an "865" number that Spence did not recognize displayed as an incoming call to her cellular phone. Spence answered the phone, and the Defendant yelled at Spence that "things didn't go the way they were planned." The Defendant instructed Spence to go and get Hutson who was still at Patton's residence.

7

Spence said that she recognized the voice on her cellular phone as the Defendant's voice because he had a "distinct accent" that is "really ghettoish." The Defendant hung up on Spence, so she tried to call Carino, but Hutson answered the phone. Hutson told Spence he was "in the woods" and did not know his specific location. Multiple phone calls were exchanged between Spence, Hutson and the Defendant. Spence described the flurry of phone calls as a "panic type situation." Ultimately, Spence said that she left her home to try and find Hutson.

Spence testified that, when she drove by Patton's residence, she saw an ambulance, fire trucks, police officers, and a helicopter. Spence recalled that she talked with Carino and told him about all the emergency personnel at Patton's residence and that she saw police arresting Hutson. Spence said that she did not know exactly where the Defendant and Carino were at that time but that, earlier, Carino had told Spence they were going back to Knoxville.

Spence testified that law enforcement came to her home the following day and gave her a copy of a search warrant. The officers also told her that she was under arrest. Thereafter, investigators interviewed Spence and, initially, she lied. Spence explained that she lied because she was told to do so, and she was scared. As the investigators began to present various pieces of evidence to Spence, she began telling the truth.

Spence testified that she had a drug problem in November 2008. She said that she used marijuana, Xanax, Percocet, and "Hydros." Spence acknowledged that, before the shooting, she had been charged with delivery of more than .5 grams of cocaine and that she was currently serving a six-year sentence on an unrelated conviction. Spence agreed that she was also charged for these offenses. She said that she hoped that her testimony would result in a more lenient sentence but that the State had not promised her anything in exchange for her testimony.

On cross-examination, Spence testified that the two men who provided her with information about Patton were Mike Fisher and Jason Coy, who bought large quantities of drugs from Patton. Spence denied ever buying marijuana from Patton and maintained that her drug source was Carino. Spence agreed that she was "high on marijuana that night" but denied any cocaine use that evening. She said that, despite the marijuana use, she had a clear recollection of the events. Spence said that she did not believe Carino knew Patton at all. Spence testified that a friend, Allison Pinson, was with her when she returned to her home and found Carino along with Hutson and the Defendant on the night of the shooting. Pinson also drove Spence to pick up Hutson because Spence did not have a valid driver's license. Spence agreed that she was also on house arrest at the time.

Anna Claire Daniels testified that she had known Hutson since the two were in sixth grade and were dating at the time of these events. Daniels said that she also knew Carino, through Hutson, and the Defendant, with whom she went to kindergarten. Daniels testified that, on the day of the shooting, she and Hutson spent the morning and afternoon together. At some point, she drove Hutson to a Taco Bell in Oak Ridge, Tennessee to meet the Defendant and Carino. Daniels said that she returned to Knoxville while the three men planned to drive to Crossville in a black Kia. She said that "they had bad intentions" to "settle a dispute." Hutson and Daniels had contact after she dropped him off at the Taco Bell, but Hutson became "very short" and evasive as to where he was and what he was doing. Daniels said she sent a text message to Hutson, but he did not respond. Daniels said that she fell asleep at her home and, when she woke up around 11:30 p.m., she noticed she had missed several phone calls from Hutson at around 10:30 p.m. Daniels said that she suspected that "something wasn't right" when she returned Hutson's phone calls, and Hutson's cellular phone was turned off. Daniels said she then called Carino's girlfriend, Ashley Snow, and learned that the men needed a ride.

Daniels testified that she, along with Snow and one of Snow's friends, drove to a BP gas station in Solway, Tennessee, to meet Carino and Hutson. When she arrived, however, she found Carino and the Defendant. When she inquired about Hutson, she was told "they've got him." She later learned that Hutson was not there because he had been arrested. Carino and the Defendant began taking items out of the vehicle they had been driving, a red Explorer, and placing the items in Daniels car. Daniels said that Carino got into her car, and the Defendant left. As Daniels drove back to Hutson's apartment with Carino, Snow, and Snow's friend, she began to understand what had occurred based on the conversation in the car. Daniels recalled that she turned onto a side road in Karns by a baseball field, and Carino got out of the car. Daniels said that she was instructed to turn the car around. She did so and when she returned to where Carino had exited her car, she saw his shoes burning on the side of the road. Carino got back into the car, and Daniels drove to Hutson's apartment.

Daniels testified that, as the night progressed, she grew more concerned about Hutson and what had occurred in Cumberland County. The following day, she contacted police and provided information about Carino's location, and he was later arrested. Daniels said that she also gave a statement to police and assisted Agent Calahan in finding the area where Carino burned his shoes. Daniels testified that she and Hutson were no longer in a relationship, although she had spoken with him "a couple of weeks ago."

On cross-examination, Daniels agreed that Hutson was the source of most of the information she provided to police. From Hutson, she had learned that the three men were going to "see about marijuana and possibly fifty thousand dollars." Daniels said that she dropped Hutson off at a Taco Bell to meet Carino and the Defendant at 6:30 or 7:00 p.m.

9

eastern time. Daniels said that she met the Defendant and Carino at the BP gas station at around midnight eastern time.

Jason Legg, a TBI agent, testified that, in November 2008, he assisted in an investigation involving the Defendant. Agent Legg said that, during the course of the investigation, a black Kia was recovered at a detail shop in Oak Ridge. Agent Legg recalled that the car was "spotless" when recovered on November 10, 2008, three days after the shooting. The detail shop's records indicated that Autumn Hale, a friend of the Defendant's, brought the car to be detailed. Based upon further investigation, Agent Legg learned that the Kia was to be sent to Atlanta and shipped to Italy where Autumn Hale's husband, a member of the armed forces, was stationed.

Dan Friel, a Tennessee Bureau of Investigation ("TBI") special agent, testified that he assisted in an investigation involving the Defendant. Investigator Friel recalled that, on November 10, 2008, he executed a search warrant at 109 East Drive, Kingston, Tennessee. Investigator Friel said that the home at this address belonged to the Defendant's mother, Mary Costello, and authorities believed the Defendant was living at his mother's home. Investigator Friel identified a TBI property release form that documented the items found during the execution of the search warrant, including a Motorola AT&T wireless cellular phone and a pair of Nike shoes.

Judy Morris, an AT&T area manager, testified that the company keeps records on all cellular phones and the usage in the ordinary course of business. Morris identified the AT&T cellular phone records submitted for a prepaid phone which included the location of the cell tower site used to connect the calls. The prepaid phone information requested was for the phone police recovered from the Defendant's mother's home. The subscriber information for the cellular phone number 865-851-3032 was "Cody Coser" with an address of "Preston Road in Dallas, Texas." Morris agreed that because identification is not required to set up a prepaid phone the information provided is unverified.

Eric Tyrell, a Sprint Nextel Telecommunications supervisor, testified that the company maintained phone records that included subscriber information, cell sites, call detail records which document incoming and outgoing calls for an account, and text message content. Tyrell explained that the company had various locations with cell sites to transmit phone calls. Tyrell said that, when a phone call is placed, the company network assesses the call to find the cell site with the strongest signal to connect to the Sprint Nextel phone. Although the strongest cell site, due to terrain or weather, may not be closest, generally the closest cell site is used to transmit the calls. Tyrell identified records his company provided in response to a legal demand in this case.

Robert Moelter, a Verizon Wireless facility manager, verified that the Verizon wireless records pertaining to the trial were maintained through the normal course of business. Moelter testified that the company keeps records of all cellular phone calls made, the cell tower used to process the call, the originating and destination number and text messages. Moelter explained that, usually, the closest cell tower to the Verizon phone user is the cell tower that processes the call.

Jeff Slayton, a Cumberland County Sheriff's Department investigator, testified that he assisted in the homicide investigation related to the Defendant. Investigator Slayton testified that, on the night of November 7, 2008, he responded to a "shots fired" call near Crab Orchard. When Investigator Slayton entered the residence, he observed Patton lying on the floor, conscious and breathing, with his eyes open. Patton appeared to have sustained multiple gunshot wounds. Several individuals were gathered around Asher attempting to stop his bleeding. Investigator Slayton said that he immediately went to the other end of the residence to make sure no shooters were still inside the home. After determining the shooters were not in the residence, Investigator Slayton returned to the Sheriff's Department to prepare a search warrant for the residence.

Investigator Slayton testified that Josh Hutson was the first to be apprehended as a suspect in this case. Hutson was found a short distance from the crime scene and was wet, dirty, and missing one shoe. Two cell phones were found on Hutson's person when authorities took him in to custody. A mask "with a definite pattern" was also found "very near" Hutson when he was apprehended. Investigator Slayton said that, once search warrants for the phones were obtained, he was able to retrieve phone information from the cell phone companies. Based upon this information, he learned that the subscriber for one of the cellular phones was Ashley Snow, Alexander Carino's girlfriend, and the subscriber for the other phone was Josh Hutson. Investigator Slayton said that the phone number assigned to Ashley Snow appeared in the "Contacts" section of Josh Hutson's phone under the name "Reno." Authorities also learned that Snow was the assigned subscriber for two cellular phones. Based upon this information, Investigator Slayton said that he suspected that Alexander Carino was the one who actually used the cellular phone for which Ashley Snow was the subscriber.

Investigator Slayton testified that in the Contacts section of Josh Hutson's cell phone there was a phone number, 865-851-3032, listed for a "Cody C." The same phone number was listed in Carino's cell phone contacts under the name "Cofer." The subscriber information provided from the phone company identified "Cody Coser" as the subscriber for this cell phone number and was associated with the cellular phone that police recovered from the Defendant's mother's residence. Police also recovered a cell phone from Amanda Spence, and the subscriber information indicated Spence was the subscriber.

11

Investigator Slayton testified that Special Agent Brad Neeland and Lieutenant Investigator Casey Cox interviewed Hutson the night of the shooting and, at some point, Hutson requested an attorney. After an attorney was appointed, Hutson gave another statement. Investigator Slayton said that, as frequently occurred in his work with defendants, Hutson was not initially truthful. Hutson omitted or changed certain facts in his statement. The same occurred with Spence in that she initially withheld information.

On cross-examination, Investigator Slayton testified that, although Hutson initially denied participation, he later identified "some people that might have been involved," one of whom was Amanda Spence. Spence was then taken in to custody, and she also provided information. Through interviews with these two suspects, authorities became aware that Carino and the Defendant might be participants in the shooting. As the investigation progressed, Spence, Hutson, and Carino began cooperating with the authorities. Hutson ultimately admitted to the possession of a .22 caliber gun on the night of the shooting, but he stated that he disposed of the weapon. Investigator Slayton agreed that the .22 caliber gun was never found.

Investigator Slayton testified that Patton "was known to deal in marijuana or sell marijuana or use it." Investigator Slayton did not recall whether marijuana was found in the residence when authorities executed the search warrant. He did recall the recovery of "at least" a thousand dollars during the search.

Dr. Feng Li, Senior Associate Medical Examiner for Davidson County, testified that his office performed autopsies for Cumberland County. Dr Li said that he performed Asher's autopsy and found gunshot wounds to the chest with injury to the major branch of the major artery and the top of the left lung. A "small fragment of jacket" was recovered during the autopsy, but a bullet was not recovered because the bullets both entered and exited Asher's body. Dr. Li testified that the gunshot wound was fatal and the manner of death was homicide.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox and Anderson counties, testified that she performed an autopsy on Patton's body. Dr. Mileusnic-Polchan found a total of eight gunshot wounds. Some of these wounds were caused by small caliber bullets, while at least one gunshot wound was due to a large caliber bullet. A small caliber bullet was retrieved from Patton's back, and a "deformed" large caliber bullet was retrieved from the pelvic area. Another small caliber bullet was recovered from Patton's buttocks. Dr. Mileusnic-Polchan testified that the cause of death was multiple gunshot wounds.

Robert Royse, a TBI Forensic Scientist, testified that he assisted in the investigation involving the Defendant. Agent Royse explained that he reported to the scene and identified

and recorded physical evidence. Multiple .40 caliber Smith and Wesson cartridge cases were recovered in Patton's living room. Additionally six .223 round cartridge cases were recovered. Agent Royse testified that this type of ammunition is associated with assault-type rifles. The shell casings were recovered "a little bit all over the place" in the living room and in the kitchen. Agent Royse explained that this distribution was because semi-automatic or fully automatic firearms eject fired cartridge cases to the right and slightly to the rear.

Agent Royse testified that he tested the Smith & Wesson .40 caliber pistol recovered in this case and examined the three .40 caliber cartridge casings recovered from Patton's home, and the bullet fragments recovered during the autopsy of Patton's body. Based upon his examination and testing, he determined that the cartridge casings recovered from Patton's home and the bullet fragments recovered from Patton's body were all fired through the barrel of the Smith & Wesson .40 caliber pistol. Agent Royse also identified a Norenco Model BWK92 S porter Carbine, commonly referred to as an AK47. Agent Royse testified that the six .223 cartridge casings recovered from the crime scene as well as the bullet fragments collected during the autopsy from Patton's body had been fired from the assault rifle.

On cross-examination, Agent Royse agreed that five bags of money, totaling approximately $2,500, and one pound of marijuana were also recovered during the search of Patton's residence.

Wilson White, a Cumberland County Sheriff's Department Correctional Officer, testified that he worked in the jail, caring for inmates. Officer White recalled one day when he was assigned to the "tower," or the central control of the maximum security area that provided a clear view of all fifty-two inmates. Officer White identified an incident report that he drafted on April 5, 2009, at 6:15 a.m. The report detailed an incident that occurred immediately after breakfast when inmates brought their food trays out of their cells and placed them on a cart. Officer White observed Carino bring his tray out of his section and the Defendant squat down and slide a piece of paper into the hallway. After Carino placed his tray on the cart, he bent down and picked up the piece of paper that the Defendant had slid into the hallway and then returned to his cell. Officer Wilson instructed another correctional officer to retrieve the paper from Carino. Officer White testified that he recognized the paper the officer retrieved as the one he saw the Defendant push out in the hallway because the paper had a torn corner. When he opened the paper, it contained all numbers. He gave the paper to Sergeant Millsted.

Officer Wilson confirmed that, from the time the Defendant slipped the note outside of his cell to the time that the correctional officer took the paper from Carino, the paper was visible to him, except for when Carino passed through a doorway that obstructed his view

13

for "[t]wo seconds at the most." Officer Wilson said that the correctional officer retrieved the paper "within a minute" of entering Carino's cell.

Lisa Bilbrey, a Cumberland County Sheriff's Department correctional officer, testified that she interpreted a code contained in a letter passed from the Defendant to Carino. Officer Bilbrey identified the letter she decoded and explained for the jury the process of deciphering codes. Officer Bilbrey read the deciphered note for the jury as follows:

[M]an, did you not hear, they have nuttin on da car, it was clean. It wasn't up here, who went in the crib with dude, no witnesses saw a car there. The police know girl was in the area, tried to pick dude up. What's girl's name when was at Amanda's? Dud girl don't know if I came up here or not. Some witness say a nigga was in the house. Did you put the clip in the little strap? You gotta know. Did you have any text in your phone? I trashed mine. They can't place, prove I had my phone. Witnesses saw two, they think three, but not for sure. Did you get back your motion of discovery? Answer all my questions. Do you think you put the clip in that, then handed it back?

On cross-examination, Officer Bilbrey testified that she did not know who wrote the code.

Tommy Calahan, a TBI agent, testified that he responded to a call, on the night of November 7, 2008, at Patton's residence in Crab Orchard. Upon his arrival, he found that the victim's bodies had been removed and the crime scene secured. Agent Calahan said that he quickly assessed the crime scene and determined that he would need substantial assistance due to the involvement of two shooters, the use of two different types of guns, and the multiple witnesses. A "Violent Crimes Response Team" was sent to help expedite the investigation and allow Agent Calahan to begin the process of interviewing witnesses. Agent Calahan said that, because investigators were not sure exactly who was involved in the perpetration of the crime, a search warrant for Patton's residence was obtained.

Agent Calahan testified that Hutson was soon taken in to custody and made a few statements but then requested an attorney. Agent Calahan said that Hutson's initial statements were not true. Agent Calahan recalled that on Sunday night, November 9, he interviewed Daniels. Daniels told investigators that Hutson was involved in the crime, and she detailed her activities from November 7 through the early morning hours of November 8.

Agent Calahan testified that, after interviewing the parties, he obtained cellular phone records. He also submitted the cellular phones of the Defendant, Carino, Hutson, and Spence to TBI Technical Services for forensic analysis. Agent Calahan identified photographs taken

14

at a location between Knoxville and Oak Ridge of burnt tennis shoes, which corroborated Daniels' statements to investigators.

Agent Calahan identified a document containing text message communication between Spence, Carino, and the Defendant. A text was sent at 11:29 a.m. on November 7, 2008, from Carino to Spence stating, "wake up, I need you to go see about them dogs 'n shit." This message appeared in both Carino's and Spence's cell phone records. Based upon the investigation, Agent Calahan believed the reference to "dogs" was in relation to Patton owning dogs. On the same date, at 12:04 p.m., Carino sent a text message to the Defendant stating, "We driving the Explorer up there?" Agent Calahan explained that the Defendant owned an Explorer. At 12:05 p.m., Carino sent another message to the Defendant that stated "it's big enough to fit bags?" Agent Calahan said that he believed Carino was asking about the gun bags. At 3:04 p.m., Carino sent another text message to the Defendant, stating "you find a car." Agent Calahan explained that he believed this to be a reference to the black, four-door Kia. The next text was a response to Carino's text message and was sent from the Defendant's phone to Carino stating, "I think so, hold on." Forty-six minutes later, another text message was sent from the Defendant's phone to Carino that said, "They got to clean out the car and I gotta total it or hide it." Agent Calahan believed this referenced what would happen to the car after the robbery. Agent Calahan said that the black Kia was found the following Monday morning after the Friday night robbery at a detail shop in Oak Ridge.

Agent Calahan testified that the next text message was one sent from Carino's phone to the Defendant asking "where you at." A response from the Defendant's phone was sent at 3:52 p.m., stating "Da Ridge." A text message was sent from Carino's phone to Spence's phone at 3:53 p.m., stating "you need to go check everything out, I'm coming out dar tonight." A response was sent from Spence's phone at 3:55 p.m., stating "Dude ain't home that takes me there, they out of town til Monday, UMMA DO ME." Agent Calahan explained that "UMMA DO ME" was Spence's "signature blog" and appeared at the end of all of her messages. Agent Calahan said that it appeared that Spence made an excuse to Carino about why she could not check out Patton's home as he requested. The next message was sent at 3:56 p.m. from Carino's phone to Spence's phone and stated, "well, go drive down there and look and see what you can see." A return text message from Spence's phone to Carino's phone stated, "K. UMMA DO ME." At 4:09 p.m., a text message was sent from Carino's phone to the Defendant's phone, stating "here I come, don't be bullshitting, cuz." Immediately after that, a message was sent from Carino's phone to Spence's phone that said, "You need to go make sure he's home." A response message from Spence's phone to Carino's phone stated, "I'm working on it." An hour later, a text message was sent from Spence's phone to Carino's phone that said, "You straight, dude is there alone and I guess the dogs are inside and no one there but him." An hour later, a text message was sent from Carino's phone to Spence's phone that stated, "Answer da phone, I'm here." A response was

sent from Spence's phone, "I'm bout to come over the bypass, UMMA DO ME." Agent Calahan said these text messages were consistent with the information Spence provided to investigators that she was not at home when Carino, the Defendant, and Hutson arrived.

Agent Calahan testified about text messages that were sent after the shooting. He said that these messages occurred primarily between Spence and the Defendant, who Spence had just met. Agent Calahan said that Spence told investigators that she did not know the Defendant's cell phone number until she received a phone call that night from an unknown number that she learned was the Defendant's number when she answered the phone call. Agent Calahan confirmed that the Defendant's cell phone number was not in Spence's list of contacts on her phone. The text messages between the Defendant's cell phone and Spence's cell phone began after the Defendant placed a phone call to Spence, which occurred after the shooting. At 10:39 p.m., a text message was sent from Spence's cell phone to the Defendant's cell phone, stating "Tell Reno to call me, UMMA DO ME." Agent Calahan said this text is significant in that Hutson had Carino's cellular phone. At 3:10 a.m. on November 8, a text message was sent from Spence's cellular phone to the Defendant's cellular phone stating, "Hey, they got dude under investigative hold 'til Monday."

Agent Calahan testified that he also compiled a record of actual calls. Agent Calahan identified a phone call between Hutson and the Defendant at 2:29 p.m. on November 7, 2008. The location of the cell tower used to connect the Defendant's call was in Oak Ridge, Tennessee. Agent Calahan said that this was consistent with the Defendant's text message at 3:52 p.m. to Carino that indicated he was in "Da Ridge." Agent Calahan testified that an incoming phone call at 4:09 p.m. from Hutson's cell phone indicated use of the Oak Ridge Tower, which showed the Defendant's continued presence in Oak Ridge. Agent Calahan noted that Autumn Hale, who owned the black Kia, lived in Oak Ridge. Agent Callahan summarized the contents of the cellular phone call records, explaining that few calls were placed before the homicide and the "cell phones [went] crazy" among the relevant parties after the homicide.

Agent Calahan testified that the first phone call placed from the Defendant's cellular phone after the shooting was to Carino's cellular phone, which was in Hutson's possession. After the phone call to Carino's cellular phone, there were two phone calls placed to Spence's cellular phone. The cell phone tower used to connect the call for the Defendant's phone was located in Crab Orchard, Tennessee. Phone calls continued to be placed and received from the Defendant's cellular phone, and the records indicated that the cell towers used included those in Crab Orchard, Ozone, Futrell Lane, Rockwood, Kingston, and Oak Ridge. Agent Calahan said that the record of the cell towers used indicated that the Defendant left Crab Orchard after the shooting and traveled to Oak Ridge and Knoxville. Agent Calahan also noted that the records showed a "dead time," with no phone usage for

16

thirty-eight minutes, from 8:55 p.m. to 9:33 p.m., which is the time frame of the homicides.

Agent Calahan testified that, based on his investigation, he suspected that the weapons might be located in or along the Clinch River, which runs between Cumberland County and Oak Ridge. Agent Calahan identified the Smith and Wesson .40 caliber pistol and the Nato .223 caliber assault rifle, which were recovered within feet of each other in the Clinch River, below the Highway 58 bridge. TBI testing confirmed that these two weapons were used in the homicides.

Following the close of proof and deliberations, the jury convicted the Defendant of two counts of felony murder and one count of attempted especially aggravated robbery.

### B. Sentencing Hearing

At the sentencing hearing, the parties presented the following proof: Danny Williams, a Board of Probation and Parole officer, testified that he prepared the investigative report for sentencing. Williams read the following statement submitted by the Defendant, as to his version of the events, "I let someone use my phone and they were involved in the crime of robbery and murder. No involvement, but my cell phone."

Williams summarized the Defendant's criminal history, which consisted of two convictions for driving without a drivers license, an evading arrest conviction, a driving on a suspended license conviction, a criminal impersonation conviction, a disorderly conduct conviction, and two misdemeanor convictions for marijuana possession. These offenses occurred between 2004 and 2007. Williams said that the Defendant's record indicated that three probation violations were filed but were subsequently dismissed. Williams said that, at the time these offenses were committed, the Defendant had pending charges and was out of jail on bond for the sale and delivery of marijuana in Knox County. Williams said that the Knox County charges were dismissed after the Defendant's trial in this case. Williams said that the Defendant admitted marijuana use since he was fifteen years old and use of ecstasy. Terry Patton, Patton's sister, read her victim impact statement at the sentencing hearing.

The trial court imposed consecutive life sentences for the felony murder convictions. For the attempted especially aggravated robbery conviction, the trial court imposed a twelve-year sentence to be served concurrently to the life sentences. It is from these judgments that the Defendant now appeals.

### II. Analysis
### A. Sufficiency of the Evidence

17

The Defendant argues that the evidence is insufficient to support his convictions. He contends that there was no proof at trial that positively identified him as a participant in these crimes. The State responds that the jury accredited the testimony of the State's witnesses and found sufficient corroboration for the accomplice testimony. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was convicted of two counts of first degree felony murder in the perpetration of an attempted especially aggravated robbery. This requires proof beyond a reasonable doubt that the Defendant killed the victim during an attempt to perpetrate an especially aggravated robbery. *See* T.C.A. § 39-13-202 (2010). The mental state required for the conviction was that the Defendant possessed the intent to commit the underlying offense, which in this case was the attempt to commit robbery.

The Defendant was also convicted of attempted especially aggravated robbery. Especially aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" where the defendant uses a deadly weapon and causes seriously bodily injury to the victim. T.C.A. §§ 39-13-401(a), -403(a) (2010). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3) (2010). Therefore, criminal attempt requires two material elements: (1) the culpability required for the attempted crime; and (2) an act in furtherance of the attempted crime. *Wyatt v. State*, 24 S.W.3d 319, 323 (Tenn. 2000).

After reviewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support the Defendant's convictions. The evidence established that the Defendant acquired a black four-door Kia to drive to Cumberland County and rob Patton. The Defendant, Carino, and Hutson, with the assistance of Spence, located Patton's residence. The Defendant, Carino, and Hutson returned to Patton's home with guns to rob Patton of money and drugs that they believed were in Patton's home. The Defendant, who carried a pistol, and Carino, who carried an assault rifle, both wore all black clothing, gloves, and face masks. They entered Patton's home and demanded money. When Patton ordered the men out of his house, the Defendant and Carino began firing in a room full of people, shooting and killing both Patton and Asher. After shooting Patton and Asher, Carino headed to the back of the home while the Defendant went through the kitchen drawers and cabinets.

19

During this time, the Defendant refused to allow Garrison to assist Asher, who was seriously injured. When Reed arrived, the Defendant and Carino fled without money or drugs. Therefore, the evidence was sufficient to establish that the Defendant killed Asher and Patton during the attempt to perpetrate an especially aggravated robbery.

The Defendant does not contest that these crimes were committed, but he argues that the proof of his identity as a participant is insufficient because, he claims, there was no corroboration of the accomplices' testimony implicating him in these crimes. It is well-settled that in Tennessee, "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). The law in Tennessee regarding accomplice testimony has been described as follows:

> The rule simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Shaw*, 37 S.W.3d at 903 (*quoting State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (citations omitted)). Whether sufficient corroboration exists is a determination for the jury. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994).

Amanda Spence and Josh Hutson both testified as accomplices regarding the plan to rob Patton. Hutson testified that he met the Defendant and Carino at a Taco Bell in Oak Ridge, and the three men drove in a black Kia to Cumberland County to rob Patton. Spence also identified the Defendant as present, first, at her apartment and, second, in the black Kia when she took Carino, the Defendant, and Hutson to Patton's residence. Daniels corroborated this testimony. She stated that she dropped Hutson off at a Taco Bell in Oak Ridge, where Hutson met the Defendant and Carino, and they were driving a black Kia. Reed also testified that a black KIA was outside parked in Patton's driveway when he arrived.

Josh Hutson testified that he, the Defendant, and Carino were present during the robbery. He said that all three men were wearing black clothing, masks, and gloves. He said that his mask differed slightly in that it had a design on the lower half of the mask. He

described Carino as carrying an AK47 and the Defendant as carrying a pistol when they entered Patton's home. Initially, Hutson remained outside, but, after hearing gunfire, he ran onto the porch and looked in the house through the door. The Defendant then ordered him back outside to keep watch. Rhinehart corroborated Hutson's testimony. Rhinehart testified that two men entered Patton's residence, dressed in all black clothing wearing masks and gloves. One man carried an AK47 while the other carried a pistol. After the two men fired their guns, a third man appeared in the doorway wearing all black with a mask that had a design. The man carrying the pistol ordered this third man to return outside to keep watch. Further, medical examiner testimony confirmed that bullets from a pistol and assault rifle were found in Patton's body.

Text messages and phone calls were also exchanged between the participants both before and after the murders occurred. Phone calls received and made from the Defendant's cellular phone indicated that these calls were connected through the nearest cell phone tower, which was located in Crab Orchard, Tennessee, the location of Patton's home. This further corroborates the Defendant's presence in the area at the time of the murders. Spence's testimony regarding phone calls between her and the Defendant after the murders was also corroborated by the cell phone records.

Based upon this evidence, we conclude that a rational jury could find the Defendant guilty beyond a reasonable doubt as to each of the counts of first degree felony murder and attempted especially aggravated robbery. Accordingly, the Defendant is not entitled to relief on this issue.

### B.  Anna Daniels Testimony

The Defendant contends that the trial court erred by not declaring Anna Claire Daniels an accomplice as a matter of law. The State responds that, after the trial court found that Daniels's role in the robbery was a question of fact for the jury to determine, it properly instructed the jury as to this issue. We agree with the State.

"An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). An accomplice is not "a person who has guilty knowledge, or is morally delinquent." *Pennington v. State*, 478 S.W.2d 892, 898 (Tenn. Crim. App. 1971). The general test is whether the accomplice could be indicted for the offense charged against the defendant. *Id*. When the evidence is clear and undisputed that a witness participated in the crime, then the trial court must declare the witness an accomplice as a matter of law and instruct the jury that the witness's testimony must be corroborated. *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). In cases where the evidence is

21

not clear, it then becomes a question of fact for the jury to determine whether the witness is an accomplice and, if so, whether there is corroborating evidence to support the testimony. *Id.*

The trial court instructed the jury as follows:

> An accomplice is a person who joins another in committing a crime. The accomplice must do so knowingly, voluntarily, and sharing the intent of another person in doing the crime. In this case the court charges you that the witnesses Amanda Ann Spence and Joshua Hutson were accomplices in this case.
>
> In this case it is a question for you to determine whether the witness Anna Claire Daniels was an accomplice in this case.
>
> The testimony of an accomplice by itself cannot convict the defendant. The accomplice's testimony must be supported by other evidence. This other evidence must independently lead to the conclusion that a crime was committed and that the defendant was involved in it. This other supporting evidence must connect the defendant to the crime. The supporting evidence must be direct or circumstantial and it need not be sufficient by itself to justify a conviction. The supporting evidence is enough if it fairly and legitimately tends to connect the defendant with the crime charged.
>
> It is for you, the jury, to decide whether the accomplice's testimony has been sufficiently supported by the evidence. Accomplice testimony cannot be supported by another accomplice's testimony.

The testimony at trial was that Hutson and Spence were both indicted for their participation in these crimes. Daniels, however, was not indicted for these crimes. Daniels testified that she drove Hutson to a Taco Bell, where he met Carino and the Defendant. She knew the men had "bad intentions" to "settle a dispute," but she was unaware of the details of their plan. Daniels testified that Hutson became evasive and "short" in their communication when she tried to learn his location and plans. Later that night, Daniels drove to pick up Hutson at a BP gas station and found only the Defendant and Carino. She inquired as to Hutson's whereabouts and was given a vague answer. As she listened to the conversation between Carino and his girlfriend, she began to put together the events of the night and became concerned. Based upon what she heard and her inability to contact Hutson, Daniels contacted the police and cooperated fully with the investigation. This evidence does not indicate that Daniels, "with common intent[,] unite[d]" in the commission of these

22

homicides and attempted robbery. Although she did provide Hutson a ride to meet his co-defendants, her role beyond that is unclear. Thus, the trial court properly left this issue to the jury for its determination. The Defendant is not entitled to relief as to this issue.

### C. Missing Witness Instruction

The Defendant argues that the trial court erred in failing to charge the jury with a missing witness instruction. The State responds that the trial court correctly refused to give this instruction because the witnesses were available to both parties. We agree with the State.

The missing witness rule in Tennessee was explained by our Supreme Court in *State v. Francis*, 669 S.W.2d 85 (Tenn. 1984). A party may comment about an absent witness and have the trial court instruct the jury on the failure of an adverse party to call an absent witness when the evidence shows that " '[1] the witness had knowledge of material facts, [2] that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and [3] that the missing witness was available to the process of the Court for trial.'" *Id*. at 88 (quoting *Delk v. State*, 590 S.W.2d 435, 440 (Tenn. 1979)). The *Francis* court added:

> The mere fact that a party fails to produce a particular person who may have some knowledge of the facts involved does not justify application of the inference against him. However, when it can be said with reasonable assurance that it would have been natural for a party to have called the absent witness but for some apprehension about his testimony, an inference may be drawn by the jury that the testimony would have been unfavorable.

Id. at 88-89 (citations omitted).

The Defendant argues that he was entitled to the instruction as to Allison Pinson, Amanda Spence's friend, who was present at Spence's home when Carino, Hutson, and the Defendant discussed the robbery. The Defendant further contends that the instruction applied to Ashley Snow, Carino's girlfriend, who was present at the BP gas station where Daniels met the Defendant and Carino after the shooting. We agree that both of these witnesses had knowledge of material facts, meaning they could have testified to the Defendant's presence at Spence's home and the BP gas station. We fail to see, however, any relationship that Pinson or Snow had with the State that would naturally incline them to favor the State.

Additionally, this Court has previously held that, to justify a missing witness instruction, the witness must not have been equally available to both parties. *See State v.*

23

*Boyd*, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992); *State v. Eldridge*, 749 S.W.2d 756, 758 (Tenn. Crim. App. 1988). We see no indication in the record that these witnesses were not equally available to the defense. Therefore, the trial court did not err in declining to give a missing witness instruction with respect to Pinson and Snow. The Defendant is not entitled to relief as to this issue.

### D. Improper Closing Argument

The Defendant asserts that the State improperly shifted the burden of proof during closing argument. Specifically, the Defendant attacks the State's argument that the Defendant could have contacted the persons associated with phone numbers, other than those of the co-defendants, in the phone records to prove that he did not possess his cellular phone at the time of these events. Additionally, the Defendant argues that the State impermissibly shifted the burden of proof to the Defendant when the State argued that the Defendant could have called Snow and Pinson as witnesses at trial. The State responds that because these comments were made in direct response to the Defendant's closing arguments and the trial court instructed the jury that closing arguments are not evidence, this issue is without merit. We agree with the State.

The Tennessee Supreme Court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn .1978)). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." *Terry*, 46 S.W.3d at 156 (citing *Sutton*, 562 S.W.2d at 823); *see Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). This Court has explained that "closing arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *See State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App.2003) (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

Defense counsel's relevant statements during closing argument are as follows:

The issue for you, ladies and gentlemen of the jury, is being able to prove and have they proved it to you that [the Defendant] had that phone in his hand when these calls were being made or close to him. If not in his hand, in the car with him and Carino. That's what's got to be proven.

I suggest, see these other calls that were right before, 9:33, 8:55, 8:51, they've got the phone numbers, [the State] could have called and asked these

24

people, say did you talk to [the Defendant] on this date and did he answer the phone.

  Come over here, look at the breaks in through here that's not color coded. That's calls that are not associated with accomplices. If you've ever had an 865-466-2557 on call number 87, if you'd had them come in and say that's fine, I called [the Defendant], yep, he answered, that would have put [the Defendant's] phone in his hand. We ain't heard none of them have we?

  . . . .

[Daniels] said she had a friend with her when she went to [BP], had a friend with her when they went and burnt the shoes you saw. That was Carino's shoes, that wasn't Cody Cofer's shoes. Had a friend with her, they dropped them off, drove down the road, turned around, saw the flames, picked them up. Where is she? [Snow] was with them at the time that [the Defendant] dropped Carino off at Solway gas station, so [Daniels] says. But where is [Snow]? She wouldn't be an accomplice, I don't think. I don't know maybe she knew all about it, too. I don't know, we ain't heard from her. Just like we haven't heard from these other people in through here that had heard from them, had the TBI simply taken the time to call these numbers up and just ask them do you know [the Defendant], yep, did you call him and show them it was billed, right here shows you, did you call him that day, well I don't really remember, but yeah, I guess I probably did. Well did somebody other than [the Defendant] answer his phone, oh no, when I called him he always answered. That would have been independent corroboration to put [the Defendant] with his phone.

In rebuttal closing, the State made the following statements related to the Defendant's complaint:

[T]he great thing about being the jury and being, sitting where you're sitting at, you can use your common sense. You get to take that common sense and go back into the deliberation room and you get to use that when you look at this evidence. And so ask yourself if you were an agent with the Tennessee Bureau of Investigation and you started calling people that [the Defendant] talks to and the people are named Weird, Hood, Dude, Fat Boy and Him Dog, tell me something, how many of those people that are friends of his do you think are going to say, yeah, I'll talk to the TBI, he's my buddy, but I'll, I'll tell

25

you?  How much cooperation do you think you're going to get out of those people?

And let me tell you something else, that witness he talks about, where was she at, why wasn't she here?  He's had her statement for two years and that witness could have been called by the defense.

. . . .

That witness could be called by the state or the defense.  And if that witness had, what she had to say was so important on either side, they could have called her.  It applies both ways.  Don't let some trick to think that we took a witness and didn't present her because we're trying to hide something.  They could have easily called her to the witness stand and asked her the questions they wanted asked and she would have answered.  And they didn't do that either.  So let's get that out of the way.

In our view, the State's argument did not call for a shifting of the burden of proof.  In closing argument, the Defendant pointed out what he believed to be an omission in the State's investigation of these crimes.  This alleged omission involved investigators' failure to call individuals, other than the co-defendants, listed on the cell phone records to confirm the Defendant's possession of his cell phone at the time of the shooting.  The State responded to this argument by explaining why it chose to pursue other leads rather than calling the Defendant's friends in hopes that one of them would elect to help the State's case against the Defendant.  As to the Defendant's complaint regarding the State's reference to Snow in rebuttal closing argument, defense counsel made an issue of the fact that Snow did not testify at trial.  The State responded, accurately, that either party believing Snow's testimony to be valuable could have called Snow to testify.

Accordingly, we conclude that the trial court properly allowed the State's argument in rebuttal.  The Defendant is not entitled to relief as to this issue.

### E. Sentencing

For his final issue, the Defendant attacks the trial court's imposition of consecutive sentencing in this case, based upon a finding that the Defendant is a dangerous offender.  The State responds that the trial court did not err in imposing consecutive sentences because the record supports the imposition of consecutive sentencing, and the trial made the requisite *Wilkerson* findings.  We agree with the State.

26

Consecutive sentencing is a matter addressed to the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, one of seven criteria applicable to the case. T.C.A. § 40-35-115(b)(1)-(7) (2010). These criteria include criteria (4), that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. T.C.A. § 40-35-115(b)(1)-(7) (2010). The trial court's finding that the Defendant is a "dangerous offender" by itself is insufficient to support consecutive sentences. In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), our Supreme Court set forth additional requirements for consecutive sentences when the defendant is a "dangerous offender." Accordingly, in order to base consecutive sentencing on the dangerous offender category, the trial court must find: (1) that the term imposed "is necessary to protect the public from further criminal acts by the offender;" and (2) "that the terms imposed are reasonably related to the severity of the offenses committed." *Id*. at 938. The requirement of additional findings when the defendant is a "dangerous offender" "arises from the fact that of all of the categories for consecutive sentencing, the dangerous offender category is the most subjective and hardest to apply." *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). The other categories for consecutive sentencing have "self-contained limits;" thus, the additional findings are limited to cases involving consecutive sentencing of "dangerous offenders." *Id*.

The trial court found applicable two criteria for consecutive sentencing: criteria (4), that the Defendant is a dangerous offender, and (6), that the Defendant was sentenced for an offense committed while on probation. T.C.A. § 40-35-115(4), (6) (2010). As to the application of criteria (4), the trial court made the following findings:

> We begin with the understanding that [the Defendant] conspires with three or four other people to go about a business outside of his hometown, which our state and our nation is open to [the Defendant], I'm not saying that. What I'm saying is when we're talking about dangerous, [the Defendant] doesn't even know where he's going. But he's going with the intent to put a mask on, wear black clothes, and go in and commit an aggravated robbery. There's a lot of other ways that [the Defendant] could go about doing his business. He could wait until no one is home, break into the home, steal the drugs and the money that he wants. But he along with three, or possibly others, . . . go to a place that they know not and to do a business with guns, which is going to involve possibly just one man being home, going in and maybe roughing him up a little or taking what they need to from him in order to get the money and the drugs that are supposed to be a great amount.

So he executes a plan while placing several others in danger, because when he gets there it's not even the same plan. You talk about dangerous, let's just keep on going with a situation, you should back out at that time if you realize that there are four or five people in the room and there's others in the back room. But that's not what he does, continues on with his plan and winds up shooting his pistol.

We know also that as the state argues he is a dangerous offender because he has other convictions. He has other probations. He has other violations of probations. He's not likely to abide by the law. It's obvious that he's not going to abide by the law, he's got cases that are pending, he's on probation. He has other probations that he commits offenses, so there's not a law that requires [the Defendant] to act in a way that the public is to act, lawfully. He's not going to do that.

The statement that was made today by Ms. Patton was that he places no value on human life. And I find that to be true. I think that's absolutely true. As I listened to the proof in this case and as the state's attorney today has pointed out to the court, even while [Asher] lays dying, there's no value on human life, even in that situation. Even where they realize the whole thing has gone bad, [the Defendant] is not going to allow there to be assistance to a man who may have been assisted, I don't know, but he's certainly not going to get the assistance. I think it was if you do that, you're going to receive the same, what I remember some of the testimony being.

. . . .

The findings that this court has to make in order for . . . 40-35-115 to be appropriate are these[:]

In the dangerous, that's number four, the defendant is a dangerous offender whose behavior indicates little or no regard for human life. And so the court finds that and has detailed that. And no hesitation about committing a crime in which the risk to human life is high. The court has detailed that.

But the court goes one step further and looks to *Wilkerson* and *Wilkerson* tells us that in a dangerous offender, when you use number four, that the court should also find that the consecutive sentence is appropriate to protect the public. And the second thing is that it relates to the severity of the offense. The state has pointed that out and the court . . . finds by

28

preponderance of the evidence that the public must be protected from this man. . . . This person is different than others. This crime is different, this crime is special. This crime, and the court has enumerated why it is special, why it is dangerous, why it is that there's no regard for others and that the public must be protected.

And second, which is so simple, is it relates to the severity. There is no more severe crime. And it certainly relates to the severity of the offense.

We conclude that the evidence supports the trial court's imposition of consecutive sentences. The evidence proved that the Defendant obtained a car, dark clothing, and gloves in preparation to rob a man in another county. The Defendant, Carino, and Hutson drove to Cumberland County to an unknown residence. The Defendant and Carino, armed with guns, entered Patton's home, where five people were seated in the living room. Almost immediately, the Defendant and Carino began firing their guns into the room of people. After shooting and seeing Patton and Asher seriously injured, the Defendant proceeded to rifle through drawers and cabinets presumably searching for drugs and money. The Defendant denied assistance to Asher, who was severely injured. Both Asher and Patton ultimately died as a result of the gunshot wounds. The Defendant and Carino only left when alerted to another person's arrival at Patton's home. The Defendant and Carino left Hutson behind and drove back toward Knoxville, discarding their weapons along the way. This evidence supports the trial court's finding that consecutive sentencing is necessary to protect the public and that the sentence is reasonably related to the seriousness of the offenses committed. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authority, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE